# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

DAVINA THERESA SUTHERLIN,              Case No. 0:16-cv-02647-DWF-KMM

            Plaintiff,

v.                                     **REPORT AND**
                                       **RECOMMENDATION**

NANCY A. BERRYHILL,

            Defendant.

James H. Greeman, Greeman Toomey, 250 Marquette Ave Ste 1380, Minneapolis, MN 55401, counsel for plaintiff

Ann M. Bildtsen, United States Attorney's Office, 300 S. 4th St. Ste 600, Minneapolis, MN 55415, counsel for defendant

        Davina Theresa Sutherlin appeals the denial of her 2012 applications for disability benefits by the Commissioner of the Social Security Administration. The parties have filed motions for summary judgment. [Pl.'s Mot., ECF No. 19; Def.'s Mot., ECF No. 21.] The parties dispute whether the Commissioner erred in concluding that Ms. Sutherlin is not disabled as a result of cognitive impairment. Ms. Sutherlin also argues that the Court should reopen consideration of an earlier application for benefits, which she filed and the Commissioner denied shortly before she filed the applications directly at issue here. For the reasons that follow, the Court recommends that Ms. Sutherlin's motion for summary judgment be denied, that the Commissioner's motion for summary judgment be granted, and that this case be dismissed.

1

## I.      Background

Ms. Sutherlin's severe impairments include obesity, degenerative disc disease of the lumbar spine with spondylosis, mild degenerative changes in the cervical spine, depression, anxiety disorder, posttraumatic stress disorder, and borderline intellectual functioning. [Admin. Record ("AR") 21, ECF No. 10.] In her summary judgment motion, Ms. Sutherlin challenges the Commissioner's conclusions concerning her intellectual functioning. In particular, she claims that the Commissioner erred in determining that she did not meet or medically equal Listing 12.05C, which is the SSA's "listed impairment,"[1] for intellectual disability. 20 C.F.R. Pt. 404, subpt. P, app. 1 § 12.05.

### Relevant History for the 2012 Applications

Before she applied for disability benefits, Ms. Sutherlin worked as a counselor, a teacher's assistant in St. Paul public schools, and an educational assistant. [AR 323.] Her earnings records indicate that she worked consistently between the years 2001 and 2006; after a break in employment, she went back to work for an eight or nine-month period in 2011 and 2012. [AR 303-04; *see also* AR 323 (listing work as a Teacher's Assistant from 2001-2006 and Educational Assistant from 2011-2012).] Ms. Sutherlin stopped working completely on June 27, 2012. [AR 321-22.] On November 1, 2012, she applied for disability income and supplemental security

---

[1]      "'[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits *without a determination whether he actually can perform his own prior work or other work.*'" *Lott v. Colvin*, 772 F.3d 546, 549 (8th Cir. 2014) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990)) (emphasis added in *Lott*). In a disability case, the SSA conducts a five-step sequential evaluation. At step three of that process, the SSA must consider whether a claimant has an impairment of sufficient severity that it meets or medically equals one of the listings. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Because this litigation concerns only step three of the process, the Court will not recite the other four well-known steps in this opinion.

income benefits. [AR 294-302.] She claimed she was disabled as a result of several health issues including: a traumatic brain injury;[2] depression; anxiety; less than full range of motion in her neck and arms; and her legs going numb at any time. [AR 321.]

The SSA denied Ms. Sutherlin's claim initially and on reconsideration, and she requested a hearing. [AR 139-70, 175-93, 235-36.] On October 6, 2014, she appeared with an attorney and testified at a hearing before Administrative Law Judge ("ALJ") Mary M. Kunz. [AR 59-104.] At the hearing, Ms. Sutherlin explained that she graduated high school and attended some college, but got "kicked out" before getting a degree because she could not pass a math course she needed to graduate. [AR 63-64, 87-88.] She described a job at Laura Jeffrey Academy where she worked as a "para" with a child in special education classes for a school year. [AR 64-65.] Ms. Sutherlin explained that following a traumatic brain injury, she struggled with "blackouts" that "used to happen every couple of days," though happened on a monthly basis around the time of the hearing. [AR 67-68.]

Ms. Sutherlin had been meeting with an ARMHS worker every week for almost eight years at the time of the October 6, 2014 hearing. [AR 91-92.] She had trouble focusing sufficiently to clean her home, read a book, or have a conversation with people. [AR 72.] She was able to concentrate while driving, but did not go very far. [AR 73.] Ms. Sutherlin drove to the grocery store where her daughter would go in and

---

[2]    There are several references in the record to a traumatic brain injury sustained by Ms. Sutherlin as a result of a domestic assault in 2003. [*See, e.g.*, AR 454.] The ALJ considered whether Ms. Sutherlin met or medically equaled Listing 12.02, which relates to organic mental disorders. 20 C.F.R. Pt. 404, subpt. P, app. 1 § 12.02. "The guidelines for evaluating impairments caused by cerebral trauma are contained in 11.18[, which] states that cerebral trauma is to be evaluated under 11.02, 11.03, 11.04, and 12.02, as applicable." 20 C.F.R. Pt. 404, subpt. P, app. 1 § 11.00F. As explained in plaintiff's memorandum, "[a] historical reference to a traumatic brain injury was referenced in the file, but no documentation of this injury or any neurocognitive testing specifically associated with this alleged impairment is available in this record." [Pl.'s Mem. at 7 (citing AR 389, 454, 495).] Ms. Sutherlin does not argue that ALJ Kunz erred in considering Listing 12.02 or her brain injury.

3

do the shopping while she waited in the car, and she would tell her daughter how to prepare food. [AR 77-78.] She took the bus to doctors' appointments. [AR 84.] She had trouble getting along with other people; she described a negative encounter with an employee at a restaurant; swearing at a supervisor from a previous job; and swearing at family members. [AR 73-74.] Ms. Sutherlin's children were in special education programs and she participated in their individualized education plans by phone. [AR 85.] She struggled to remember appointments and things her children tell her, and she used sticky notes to write things down so she would not forget. [AR 75, 94.] Using funds she received from various assistance programs, Ms. Sutherlin paid her bills by going to the store to obtain money orders. [AR 76-77.]

Following the October 2014 hearing, Ms. Sutherlin's attorney asked ALJ Kunz to hold the record open because Ms. Sutherlin had testified to experiencing worsening symptoms since a January 2010 psychological evaluation and had scheduled a new evaluation "to reevaluate her cognitive abilities." [AR 370.] On November 20, 2014, Ms. Sutherlin underwent additional psychological testing, which led to assignment of a full-scale IQ score of 67 and a determination that her "cognitive functioning is very low to borderline." [AR 705-27.] After administering the Minnesota Multiphasic Personality Inventory ("MMPI") test, Jeffry G. Ford, the licensed psychologist who performed the tests, stated that Ms. Sutherlin's "low level of cognitive functioning [combined] with Severe Depression and Borderline Personality make it quite unlikely she would be able to find viable employment and sustain it for any length of time." [AR 722.] Mr. Ford concluded from the testing that Ms. Sutherlin would have trouble sustaining attention, concentrating, and exerting mental control and that she would struggle to keep up with her peers in terms of thinking and reasoning abilities. [AR 714, 722.]

On January 5, 2015, ALJ Kunz sent a medical interrogatory and Ms. Sutherlin's treatment records, including the most recent test results, to a medical expert on contract with the SSA, Dr. Michael A. Lace. [AR 729.] On January 13, 2015, Dr. Lace responded to the interrogatory, observing that Ms. Sutherlin had likely over-reported

symptoms in her November 2014 psychological testing, and opining that her records demonstrated: mild restrictions in the area of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation. [AR 732.]

Ms. Sutherlin requested a supplemental hearing to question Dr. Lace. [AR 375.] ALJ Kunz held a supplemental hearing on April 22, 2015, and Ms. Sutherlin testified briefly at that hearing about issues she had during her school years. [Suppl. AR 796-821[3].] Ms. Sutherlin explained that she had special help with reading during third grade, which she had to repeat. [Suppl. AR 800-02; *see also* AR 86.] She also went to truancy court when she was in the sixth grade and spent a year in an alternative school for behavioral issues. [Suppl. AR 802-03.] She also had a disciplinary incident at one job where she swore at her boss. [Suppl. AR 805-06.]

Dr. Lace testified that although he did not conclude that Ms. Sutherlin had willfully over-reported her symptoms during the MMPI test performed by Mr. Ford, she was "likely over reporting based on the validity scales." [Suppl. AR 810.] He also testified about the validity of the full-scale IQ scores of 67 and 73 that were reflected in Ms. Sutherlin's treatment records. [*See id.* at 813, 817-20.] With respect to an alleged intellectual disability, ALJ Kunz made clear that, in her view, the key issue was whether the records show Ms. Sutherlin had deficits in adaptive functioning. [*Id.* at 819-20.]

In denying Ms. Sutherlin's disability claim, ALJ Kunz specifically found that the criteria for Listing 12.05 were not established in the record. [AR 24.] ALJ Kunz stated:

> The record does contain two sets of IQ scores; one indicating a[ ] Full Scale IQ score of 73 and testing in 2014 indicating a Full Scale IQ score of 67. . . . It is not necessary, and likely not possible, to resolve the

---

[3]       In the Administrative Record initially filed by the Commissioner, the transcript of the April 22, 2015 hearing was incomplete. The Commissioner supplemented the record with a full transcript of the hearing. [AR 796-821, ECF No. 18.]

differences between these scores because the record does not document the requisite deficits in adaptive functioning which would be necessary to establish a Section 12.05 impairment.

[AR 24.] ALJ Kunz explained why she reached this conclusion: (1) Ms. Sutherlin's need to repeat third grade was based on "truancy and behavioral issues, rather than cognitive losses"; (2) she graduated high school at age 19 and attended a two-year college program, completing all but three classes necessary to earn a degree; (3) she had a driver's license, can handle money orders to pay bills, and manages public assistance funds she receives; and (4) she held full-time employment for six or seven years in the past as a teacher's aide. [AR 24.]

### Ms. Sutherlin's Earlier Application

Ms. Sutherlin filed a previous application for disability benefits, which was also denied by the SSA. In that earlier case ALJ David B. Washington presided over a May 14, 2012 hearing. Though she appeared at the hearing, Ms. Sutherlin was not represented by counsel or any representative. [AR 105-19.] At the start of the hearing, ALJ Washington and Ms. Sutherlin discussed that an ARMHS worker that had been acting as her representative was not present. ALJ Washington noted that the ARMHS worker had not withdrawn an appearance that she had entered and asked Ms. Sutherlin if she wanted to go ahead with a hearing without a representative. Ms. Sutherlin stated that she wanted to go forward with the hearing. [AR 108.] At that time, Ms. Sutherlin was working about four hours a day at Laura Jeffrey Academy, but she had fallen asleep at work and had difficulty concentrating given her medications. [AR 110.] She explained that her children, who were 13, 12, and 8 years old, helped her by doing most of the work around the house. She also testified that she used to go fishing and that she no longer spent much time with friends. [AR 111-12.]

On May 23, 2012, ALJ Washington determined that Ms. Sutherlin was not disabled. [AR 120-38.] Like ALJ Kunz several years later, ALJ Washington determined that Ms. Sutherlin did not meet or medically equal any of the Listings. With respect to her mental impairments, ALJ Washington concluded that Ms. Sutherlin had moderate

restrictions in daily living, social functioning, and in concentration, persistence, and pace. [AR 127.] At that time, Ms. Sutherlin's records showed a full-scale IQ score of 73 from January 5, 2010. [AR 113; AR 393.] Considering the Listing for intellectual disability, ALJ Washington explained:

> The undersigned also considered Listing 12.05, but finds that the claimant's adaptive functioning scores did not support a finding of [intellectual disability]. Further, IQ testing showed borderline intellectual functioning and not [intellectual disability].

[AR 128.] In reaching these conclusions, ALJ Washington noted that Ms. Sutherlin: cared for her children; maintained a relationship with a boyfriend; went to school five days a week in the afternoon; was able to work part-time; attended school conferences; and babysat a friend's child. [AR 126-27.]

The Notice of Decision accompanying ALJ Washington's written opinion explained that Ms. Sutherlin could file an appeal by asking the Appeals Council to review the decision in writing and noted that the appeal must be filed within 60 days of the date she received the Notice. [AR 120.] Ms. Sutherlin did not file an administrative appeal of ALJ Washington's decision. [Pl.'s Mem. at 24.]

## II.    Discussion

In her challenge to the Commissioner's denial of benefits, Ms. Sutherlin raises two main issues. First, she contends that ALJ Kunz erred in determining that she did not meet or medically equal Listing 12 .05 for intellectual disability. Second, Ms. Sutherlin argues that her prior application should be reopened. The Court finds that ALJ Kunz's decision is supported by substantial evidence and that reopening the prior application is unwarranted under the circumstances of this case.

### A. Legal Standard

The Court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g), and the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). This review is deferential, *see Kelley*

*v. Barnhart*, 372 F.3d 958, 960 (8th Cir. 2004), and is "limited to determining whether there is substantial evidence based on the entire record to support the ALJ's factual findings, and whether [the] decision was based on legal error." *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996); s*ee also Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "Substantial evidence is less than a preponderance of the evidence, but is such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014) (internal citations and quotation marks omitted). Where substantial evidence supports the Commissioner's findings, the Court should not reverse those findings merely because other evidence exists in the record to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994).

### B. Listing 12.05C

Ms. Sutherlin argues that she has IQ scores that meet the requirements of Listing 12.05C and that the record demonstrates that she suffers deficits in adaptive functioning with onset during the developmental period. She also argues that in reaching the opposite conclusion, ALJ Kunz assigned undue weight to Dr. Lace's medical opinion. Finally, she argues that ALJ Kunz erred by failing to adequately consider the issue of medical equivalence. [Pl.'s Mem. at 14-26.]

### The Criteria

Listing 12.05C creates a category of mental disability where the evidence establishes the following:

> [S]ignificantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22 [and]
>
> . . . .
>
> A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

Listing 12.05C.[4] "[T]he requirements in the introductory paragraph are mandatory." *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006).

"In other words, 'Listing 12.05C requires four elements: (1) deficits in adaptive functioning; (2) evidence of initial manifestation before age 22; (3) a valid verbal, performance or full-scale IQ score between 60 and 70; and (4) 'a physical or other mental impairment imposing an additional and significant work-related limitation of function.'" *Perryman v. Colvin*, No. 12-cv-247 (MJD/JSM), 2013 WL 4435385, at *19 (D. Minn. Aug. 16, 2013) (quoting *Contreras v. Astrue*, No. 08-cv-1196 (DWF/JJK), 2009 WL 5252828, at *6 (D. Minn. Aug. 26, 2009) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05).[5] The claimant has the burden of establishing her impairment meets all the requirements of one of the Listings. *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011).

Here, ALJ Kunz essentially assumed without deciding that Ms. Sutherlin had a qualifying IQ score. She found that it was "not necessary, and likely not possible" to resolve the contradiction between Ms. Sutherlin's full-scale IQ scores of 73 and 67 because she did not demonstrate the deficits in adaptive functioning that are necessary to establish a Section 12.05 impairment. [AR 24.] The Commissioner does not dispute that Ms. Sutherlin satisfied the criteria in subsection C requiring a qualifying IQ score and the presence of another severe impairment. [Def.'s Mem. at 7-8.] Accordingly, the

---

[4]    As the parties point out, the criteria for Listing 12.05C was changed after the ALJ Kunz's May 12, 2015 decision in this case. [Pl.'s Mem. at 14 n.3; Def.'s Mem. at 6 n.1.] The current version of Listing 12.05C, which became effective January 17, 2017, differs from the 2015 version at issue here.

[5]    *See also Johnson v. Colvin*, 788 F.3d 870, 872 (8th Cir. 2015) ("These requirements clearly include demonstrating that the claimant suffered deficits in adaptive functioning and that those deficits initially manifest during the developmental period before age 22.") (internal quotations and alterations omitted).

Court likewise assumes Ms. Sutherlin has a qualifying IQ score.[6] Instead, the parties' dispute with respect to Listing 12.05C hinges on the ALJ's finding concerning deficits in adaptive functioning.[7]

The Social Security regulations do not define the phrase "deficits in adaptive functioning" in listing 12.05's introductory paragraph. Recently, in *Scott v. Berryhill*, 855 F.3d 853, 856-57 (8th Cir. 2017), the Eighth Circuit affirmed a district court determination that a claimant did not show sufficient deficits in adaptive functioning to meet Listing 12.05C and provided some useful guidance. In *Scott*, the record showed that the claimant: (1) completed high school; (2) was able to engage in unskilled or semi-skilled work; (3) could read, balance a checkbook, manage finances or complete forms; (4) could live independently, communicate well, think logically, has a driver's license, can drive and shop for groceries on a weekly basis, and perform simple math; and (5) could cook meals, do laundry, do household chores, follow instructions, and does not need reminders to finish tasks. *Id.* The Eighth Circuit's consideration of these factors aligns with the view expressed by other courts: a reviewing court considering the issue of deficits in adaptive functioning "examine[s]

---

[6]    Whether Ms. Sutherlin has a physical or other mental impairment imposing an additional and significant work-related limitation of function is undisputed; the Commissioner concedes that the record establishes she has such qualifying additional severe impairments. [Def.'s Mem. at 8.]

[7]    Although Ms. Sutherlin is correct that an individual's IQ is presumed to remain consistent over time, [*see* Pl.'s Mem. at 15-16], this case does not turn on any finding that deficits in adaptive functioning did not begin during the developmental period. ALJ Kunz found that the record does not support sufficiently severe deficits in adaptive functioning at all, and therefore did not address what the record revealed about when Ms. Sutherlin's limitations manifested themselves. [AR 24 ("[T]he record does not document the requisite deficits in adaptive functioning which would be necessary to establish a Section 12.05 impairment.").] However, the Court notes that the evidence concerning Ms. Sutherlin's adaptive deficits during the developmental period is quite thin. For instance, she received some special help with reading during one grade, which she had to repeat, but otherwise graduated from high school without the need for special education.

the overall record to determine whether [the claimant] has significant limitations in her ability to cope with the challenges of ordinary everyday life[.]" *Perryman*, 2013 WL 4435385, at *20.

Here, ALJ Kunz explained the basis for her finding that "the record does not document the requisite deficits in adaptive functioning which would be necessary to establish a Section 12.05 impairment" as follows:

> The claimant acknowledged repeating the third grade and later day treatment, but these experiences were related to truancy and behavioral issues, rather than cognitive losses. She testified she had to repeat third grade, not because she could not do the school work, but because her mother stopped sending her to school routinely after her father was imprisoned. . . . She further indicated she did not receive special education services, other than in third grade. The claimant graduated from high school at the age of 19 and testified at the initial hearing that she attended High Tech Institute enrolling in a two-year postsecondary program and was only three classes away from completing the degree requirements when she was not able to finish. She has a valid driver's license, and testified she can handle money and pay bills with money orders. She has worked at substantial gainful activity levels in the past and worked for six to seven years in the Saint Paul Public Schools as a teacher's aide. . . . She is a single parent of three children and testified that she can manage the $621 in MFIP funds she receives on their behalf. As a result, the undersigned finds that the requirements of section 12.05C are not established by this record because the record does not establish deficits in adaptive functioning.

[AR 24.]

Although this is a close and difficult case, the Court concludes that the ALJ's findings are supported by substantial evidence. Ms. Sutherlin graduated high school and her work history includes several years of work in skilled or semi-skilled employment as a counselor or teacher's aide. She has a driver's license and is able to operate her own vehicle. When she doesn't feel comfortable driving, she is capable of using public transportation to get to and from her doctor's appointments. She completed a significant portion of a two-year postsecondary educational program,

though she ultimately was not able to pass the algebra and biology classes she needed to earn her degree. Ms. Sutherlin also explained how she obtains money orders when she receives funds from public assistance programs and uses them to pay her bills. Such evidence provides a substantial foundation for ALJ Kunz's conclusion that Ms. Sutherlin does not have significant limitations in her ability to cope with the challenges of ordinary everyday life such that she does not meet Listing 12.05C.

Ms. Sutherlin's level of functioning is comparable to the claimants' abilities in other cases rejecting disability claims because the record does not support the deficits in adaptive functioning required by Listing 12.05C. *See, e.g.*, *Vance v. Berryhill*, 860 F.3d 1114, 1119-20 (8th Cir. 2017) (upholding ALJ's conclusion regarding deficits in adaptive functioning where claimant could "read, write, pay bills, count change, groom herself, cook, perform household chores with her daughter's help, shop, go out to eat, attend church, and talk on the phone"); *Scott*, 855 F.3d at 856-57; *Ash v. Colvin*, 812 F.3d 686, 691 (8th Cir. 2016) (insufficient deficits in adaptive functioning where the claimant had qualifying IQ score and could not balance a checkbook, but lived independently, had a driver's license, shopped for groceries, cooked, and performed household tasks); *Johnson v. Colvin*, 788 F.3d 870, 872-73 (8th Cir. 2015) (insufficient deficits in adaptive functioning where claimant had some reading and writing ability, could count change, cared for a child, and performed household tasks).

Other evidence in the record also supports the finding that Ms. Sutherlin does not have such significant limitations in her ability to cope with everyday life so as to constitute deficits in adaptive functioning. Therapy treatment records from Catholic Charities indicate that Ms. Sutherlin was active in planning activities for her children during the summer and was spending time with family members. [AR 606-07, 612-13, 615-16, 624-26.] Although, in evaluating the medical records at the reconsideration level, Dr. Mary Sullivan candidly noted that this is a "very complex case" and acknowledged evidence of Ms. Sutherlin's difficulties, Dr. Sullivan also observed that Ms. Sutherlin "buys furniture, plans and hosts a birthday party for her son at her place, [and] schedules her children for YMCA summer camp and activities," albeit

with assistance from her ARMHS worker. [AR 182-83.] Dr. Sullivan also noted that records also showed Ms. Sutherlin's participation in postsecondary school. [AR 183.] Dr. Sullivan noted that Ms. Sutherlin was able to give "a detailed history" despite her memory-related issues and that Ms. Sutherlin was heavily involved with her children. Dr. Sullivan noted that Ms. Sutherlin was active in "getting [her children] on the bus, making dinner for them, looking after them when they return from school, making sure their homework is done, going to school conferences, [and] going grocery shopping, yet states she avoids public places." [AR 183.] Dr. Sullivan also observed that Ms. Sutherlin was "deemed capable of handling of her own funds." [AR 183-84.]

A consultative examination conducted by Dr. Alford Karayusuf also supports the finding that Ms. Sutherlin does not have the required deficits in adaptive functioning to meet Listing 12.05C. [AR 491-93.] Dr. Karayusuf concluded that Ms. Sutherlin had impairment in recent recall and diminished concentration and memory, but he concluded that she would still be able to understand, retain, and follow simple instructions. He also found that Ms. Sutherlin could tolerate brief, superficial, and infrequent interactions with co-workers, supervisors, and the public. Within these parameters, he determined that she could maintain persistence and pace in a work setting where she would be required to do simple, routine, repetitive, concrete, tangible tasks. The ability to work within these restrictions does not suggest the required level of deficits in adaptive functioning to meet Listing 12.05C.

Ms. Sutherlin argues that there is "ample evidence that [she] experiences significant deficits in adaptive functioning." [Pl.'s Mem. at 18.] She points to her own testimony stating that she has a difficult time reading, hesitates to use the stove or microwave, does not drive to unfamiliar places, relies upon her children for help with household chores, and lost a job as a classroom assistant because she could not pass a math test. [*Id.*] There is no question that the record contains evidence that Ms. Sutherlin experiences limitations in her daily life as a result of both her mental and physical impairments. However, even if the highlighted evidence could support a different conclusion, reversal is inappropriate if other substantial evidence supports

13

the ALJ's conclusion. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015) (requiring the court to affirm the ALJ's conclusion "it if is possible to draw two inconsistent positions form the evidence and one of those positions represents the ALJ's finding"). This is precisely the situation here.

     In essence, the ALJ discredited Ms. Sutherlin's claims of more significantly limited adaptive functioning. Under these circumstances, the Court must also consider ALJ Kunz's credibility determination in evaluating the issue of deficits in adaptive functioning.[8] ALJ Kunz concluded that Ms. Sutherlin's mental impairments could credibly result in limitations like those she claimed, but that Ms. Sutherlin's statements about the severity of the limitations she experienced were not fully credible based on inconsistencies in the record as a whole. [*See* AR 25 ("[T]he undersigned cannot find her allegations credible that she is incapable of all work because of significant inconsistencies in the record as a whole."); *see also* AR 27-28 (explaining the reasons for finding the objective evidence and course of mental health treatment "inconsistent with the degree of limitation alleged by the claimant.").] ALJ Kunz's observations in the context of her credibility ruling and her finding concerning deficits in adaptive functioning mirror one another and are both supported by substantial evidence on the record as a whole. [*Compare* AR 24 (discussing testimony at the hearing and other evidence concerning adaptive functioning), *with* AR 29 (discussing daily activities that exceeded those described at the hearing).] The credibility finding is therefore entitled to deference. *See Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). And ALJ Kunz's credibility assessment further supports the determination that Ms. Sutherlin did not demonstrate the deficits in adaptive functioning necessary to meet Listing 12.05C. *Cf. Courter v. Comm'r of Soc. Sec.*, 479 Fed. App'x 713, 722 (6th Cir. 2012) ("[T]he mere fact of a qualifying IQ score does not require that the ALJ find

---

[8]    Ms. Sutherlin does not directly challenge ALJ Kunz's explicit credibility finding.

[intellectual disability] under Section 12.05B when substantial evidence supports the contrary conclusion *or the claimant's allegations of her capabilities are deemed not credible*.").

Ms. Sutherlin relies on *Lott v. Colvin*, 772 F.3d 546 (8th Cir. 2014), to support her argument that ALJ Kunz did "not adequately explain how [Ms. Sutherlin's] extremely limited daily activities result in no more than 'mild' limitations." [Pl.'s Mem. at 17.][9] In *Lott*, the plaintiff had the ability to perform only rudimentary activities of daily living and the ALJ specifically found that the claimant had a severe impairment of "mild mental retardation." *See id.* at 547-48 (describing a psychologist's diagnosis and the claimant's limited abilities in reading, inability to count change, the need for the help of others to help him pass a test to obtain a driver's license). Mr. Lott argued that it was inconsistent for the ALJ to find that he had a severe impairment of "mild mental retardation" but not significantly sub-average general intellectual functioning with deficits in adaptive functioning. The court agreed, remanding the case "to the ALJ to resolve both the internal inconsistencies in her decisions and the unexplained inconsistencies with [a psychologist's] opinion." *Id.* at 551.

The decision in *Lott* does not require a different outcome in this case for several reasons. First, Ms. Sutherlin points to no opinion by any treating mental health provider, examining source, or non-examining consultant that is inconsistent with ALJ Kunz's findings concerning Listing 12.05C.[10] Second, as described above, there is substantial evidence in the record supporting ALJ Kunz's determination concerning

---

[9]      Ms. Sutherlin's reliance on *Bailey v. Apfel*, 230 F.3d 1063, 1065 (8th Cir. 2000), is also misplaced. There the court found that the ALJ erred in discrediting qualifying IQ scores based on the claimant's limited daily activities. 230 F.3d at 1065-66. Here, ALJ Kunz did not reject a qualifying IQ score based on Ms. Sutherlin's daily activities and, instead, found that the claimant did not demonstrate adequate deficits in adaptive functioning to meet Listing 12.05C.

[10]      Additionally, in *Lott*, the ALJ failed to make specific findings concerning adaptive functioning and to have an IQ test administered, which also motivated the court's decision to remand. *See Scott*, 855 F.3d at 857 (concluding that *Lott* was "inapplicable" for similar reasons). Neither issue is present in Ms. Sutherlin's case.

Ms. Sutherlin's ability to engage in activities of daily living, which are more substantial than the abilities of the plaintiff in *Lott*. Finally, to the extent Ms. Sutherlin suggests that the ALJ was required to find she meets Listing 12.05C because she has a severe impairment of borderline intellectual functioning, such an argument fails as a matter of law. *See Ash*, 812 F.3d at 693 (distinguishing *Lott* and concluding that the fact "the ALJ characterized Ash's impairment as mild mental retardation at step two did not preclude the ALJ on this record from finding at step three that Ash did not exhibit deficits in adaptive functioning").

### Onset Prior to Age 22

Even were Ms. Sutherlin correct that the ALJ's findings concerning her current adaptive functioning were unsupported in the record, she would face an additional barrier to satisfying Listing 12.05C: onset of limitations prior to age 22. Aside from the presumption that her IQ has remained the same throughout her life, the only evidence in the record concerning adaptive deficits during the developmental period is Ms. Sutherlin's participation in special classes for reading assistance during third grade, which she repeated, and her truancy problems and behavioral issues when she was in sixth grade. These are not the type of significant issues during the developmental period contemplated by Listing 12.05C.

### Weight Assigned to Dr. Lace

The next issue Ms. Sutherlin raises concerning the Commissioner's finding that she does not meet Listing 12.05C relates to the weight ALJ Kunz assigned to the opinion of Dr. Lace. [Pl.'s Mem. at 20-21.] In ALJ Kunz found that Dr. Lace's opinion was entitled to "great weight" because it was "generally consistent with the whole body of objective medical evidence and Dr. Lace had access to the entire record of medical evidence. Further, Dr. Lace is an expert in clinical psychology who is familiar with the standards under which disability is determined for Social Security benefits." [AR 24.]

Ms. Sutherlin contends that Dr. Lace's opinion was not entitled to great weight because: (1) he failed to consider Listing 12.05 for meeting/equaling analysis"; (2) he erroneously believed "that a diagnosis of mental retardation is required for a 12.05C analysis"; and (3) he erroneously suggested that Ms. Sutherlin may have over-reported symptoms during a 2014 test that resulted in a full scale IQ score of 67. [Pl.'s Mem. at 20-21.] Ms. Sutherlin is correct that Dr. Lace did not specifically mention Listing 12.05 in his response to the medical interrogatory provided by ALJ Kunz. [AR 733 (indicating consideration of Listings 12.02, 12.04, 12.06 and 12.08).] Ms. Sutherlin is also correct that Dr. Lace testified that it is his understanding that a diagnosis of "mental retardation" must be present for Listing 12.05C to be met or equaled. [Suppl. AR 811.] And Dr. Lace's written response to the interrogatory stated that he reached the conclusions he did, in part, based on likely over-reporting of symptoms by Ms. Sutherlin during the MMPI exam she received in 2014. [AR 732.]

However, the Court finds that none of these issues requires reversal of the Commissioner's decision. The alleged errors identified by Ms. Sutherlin with respect to Dr. Lace's opinion are either harmless or they are not errors at all. It is true that Dr. Lace was incorrect to the extent he believes that a diagnosis of mental retardation is required to meet Listing 12.05C. *See Maresh*, 438 F.3d at 899 (disagreeing with the Commissioner's position that Listing 12.05C requires a formal diagnosis of "mental retardation"). However, that mistake is irrelevant here. There is no indication that ALJ Kunz reached her conclusion with respect to Listing 12.05C based on a similarly incorrect understanding of the law. Nor is there any indication that ALJ Kunz's decision concerning deficits in adaptive functioning would have been different if Dr. Lace correctly understood that a diagnosis of retardation is not a prerequisite.

Second, it is unclear how Ms. Sutherlin contends that Dr. Lace's failure to specifically include Listing 12.05 in his answer to the medical interrogatory undermines the ALJ's reliance on his opinion or her finding regarding deficits in adaptive functioning. During the April 22, 2015 hearing, Dr. Lace responded to a number of questions concerning Listing 12.05, [Suppl. AR 811-20], but most of those

17

questions did not directly implicate the deficits-in-adaptive-functioning. At one point during the testimony, Dr. Lace was asked whether he had "taken into consideration [Ms. Sutherlin's] adaptive functioning during the developmental period," to which he responded that he had and that his thoughts on the issue were reflected in his answer to the interrogatory he received from ALJ Kunz. [Suppl. AR 815.] Dr. Lace's answer to the interrogatory points to evidence in the record that supports ALJ Kunz's finding on the issue of deficits in adaptive functioning. [AR 731-33.] Any error committed by Dr. Lace in his answer to the medical interrogatory is, therefore, harmless.

Finally, the Court disagrees that the ALJ should have rejected or discounted Dr. Lace's opinion due to his observation that Ms. Sutherlin may have over-reported symptoms during her 2014 MMPI test. Dr. Lace clearly explained that he did not believe Ms. Sutherlin was a malingerer, which is consistent with Mr. Ford's remarks following the MMPI evaluation. But Mr. Ford's report does, in fact, indicate that Ms. Sutherlin may have over-reported or exaggerated symptoms during the testing without being a malingerer. [AR 708 (indicating that Ms. Sutherlin's reporting of a "larger than average number of symptoms" did not suggest willful over-reporting.] The Court finds Ms. Sutherlin's criticism of Dr. Lace's opinion on this issue unpersuasive.

### Medical Equivalence

Ms. Sutherlin next argues that the Commissioner's decision should be reversed because ALJ Kunz failed to adequately consider whether Ms. Sutherlin's combination of impairments is medically equivalent to Listing 12.05C. [Pl.'s Mem. at 21-23.] She contends that the ALJ's decision provides no basis for determining whether the ALJ gave due consideration to the question of medical equivalency and there is no way to

tell whether the ALJ considered the relevant provision of the Program Operations Manual System (POMS), POMS § DI 24515.056.[11] [*Id.* at 22-23.]

The Eighth Circuit has explained that even if a claimant does not meet Listing 12.05C, that "does not end the inquiry" because the Commissioner must consider the question of medical equivalency. *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003). "The regulations provide that if a claimant has more than one impairment, the combined effect of the impairments will be considered." *Id.*

> If you have a combination of impairments, no one of which meets a listing . . ., we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.

20 C.F.R. § 404.1526(b)(3).

In her written decision, ALJ Kunz clearly found that the record did not provide a basis for a finding of medical equivalency. The decision states that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or *medically equal* the criteria of listings 12.02, 12.04, *12.05*, 12.06, and 12.08." [AR 21

---

[11]    This POMS section provides:

> Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

POMS § DI 24515.056, https://secure.ssa.gov/poms.nsf/lnx/0424515056 (last visited November 15, 2017).

(emphasis added).] Further, ALJ Kunz further indicated that she considered the issue of medical equivalence in describing the weight assigned to Dr. Lace's opinion that none of the listings were met or medically equaled. [AR 24.] Given ALJ Kunz's explicit statements concerning medical equivalence, the Court disagrees with Ms. Sutherlin's assertion that "[t]here is no evidence that this ALJ gave due consideration to medical equivalence. . . ." [Pl.'s Mem. at 23.]

Ms. Sutherlin's medical equivalence argument relies on the Eighth Circuit's decision in *Shontos*. There, the Eighth Circuit found error in an ALJ's conclusion that failed to consider the POMS guidelines for medical equivalence under Listing 12.05C. Ms. Shontos' IQ score of 72 was just above the qualifying range of 60-70, and the POMS guidelines requires consideration of medical equivalence in such a case. *See* 328 F.3d at 424-25 (citing POMS § DI 24515.056). The record reflected that the ALJ disregarded that provision of the POMS guidelines and failed to consider medical equivalence. *Id.*

Ms. Sutherlin's reliance on *Shontos* and the POMS guidelines' provision is unpersuasive.[12] The starting point for the Court's analysis lies in POMS § DI 24515.056 itself, which provides that "[t]he criteria for [Listing 12.05C] are such that a medical equivalence determination would very rarely be required." Moreover, it is far from clear that POMS § DI 24515.056 is even relevant to the issues presented in this litigation. The provision suggests that a finding of medical equivalence may be appropriate when a claimant has an IQ score "slightly higher" than the qualifying

---

[12]    The ALJ's medical equivalence finding in *Shontos* was also the product of erroneous assignment of weight to several medical opinions. 328 F.3d at 424-25 ("In reaching his decision that Ms. Shontos' impairment or combination of impairments were not medically equivalent to a listed impairment, . . . [the ALJ] discounted the medical opinion of Ms. Shontos' treating psychologist, and the opinions of Ms. Shontos' therapist and nurse practitioner . . . in favor of the opinions of non-treating, non-examining physicians and psychologists who relied exclusively on the medical reports of others. . . .'"). Ms. Sutherlin does not point to any comparable mistakes in this case.

range. But Ms. Sutherlin had a qualifying IQ score between 60 and 70. This satisfied the IQ score criteria of Listing 12.05C, and nothing else in POMS § DI 24515.056 applies in such a scenario. Nor does the provision say anything about medical equivalence when an ALJ finds that the claimant fails to meet or medically equal criteria in Listing 12.05C other than the IQ component.

Neither POMS § DI 24515.056 nor the discussion of medical equivalence in *Shontos* addresses the real issue in this case, which is the validity of ALJ Kunz's finding that Ms. Sutherlin failed to show the required deficits in adaptive functioning. Therefore, even if ALJ Kunz committed some error with respect to POMS § DI 24515.056, Ms. Sutherlin does not explain how the outcome would have been different if such an error were not present. Because any error concerning the POMS guidelines was harmless, the Court affirms the determination that Ms. Sutherlin's impairments did not medically equal Listing 12.05C.

### C. Reopening the Prior Application

Ms. Sutherlin argues that her prior application, which was denied in ALJ Washington's May 23, 2012 decision, should be reopened for good cause pursuant to Social Security Ruling (SSR) 91-5p, 1991 WL 208067 (July 1, 1991), or the SSA's *Hearings, Appeals, and Litigation Law Manual* (HALLEX) I-2-9-40, https://www.ssa.gov/OP_Home/hallex/hallex-I.html. [Pl.'s Mem. 23-25.] In essence, she contends that there is good cause for her failure to timely appeal ALJ Washington's decision to the Appeals Council because she was unrepresented at the hearing that preceded the decision and lacked the mental capacity to understand the Notice that advised her of her appeal rights. [*See id.*]

Pursuant to 42 U.S.C. § 405(g), district courts have jurisdiction over final decisions of the Commissioner following a hearing. Under *Califano v. Sanders*, 430 U.S. 99, 107-09 (1977), a decision not to reopen a previous determination is not such a

final decision.[13] *See also Hardy v. Chater*, 64 F.3d 405, 407 (8th Cir. 1991) (same). "To allow plaintiff to raise [the issue of reopening a prior application] for the first time on appeal to this Court would short circuit the administrative process and deprive the agency of the opportunity to apply its own appeals policies." *Myers v. Astrue*, 870 F. Supp. 2d 1164, 1169 (D. Colo. 2012). In *Myers*, the court declined to address the claimant's request for review of disability claims presented in a prior application; neither the claimant nor her attorney had asked the Commissioner to reopen her earlier applications and therefore she had not pursued the appropriate administrative remedies prior to seeking judicial review. *See id.*

The same approach is appropriate here. There is no indication in the record that Ms. Sutherlin or her attorney (who began representing her before the time for appealing ALJ Washington's denial of her prior application had expired) have ever filed a request with the Commissioner to have the earlier application reopened. Indeed, ALJ Kunz observed that Ms. Sutherlin had not requested reopening of the prior application and decision during her consideration of the current application. [AR 18.] Similarly, after ALJ Kunz denied Ms. Sutherlin's claim, Ms. Sutherlin's counsel did not request reopening of the previous case in the brief submitted to the Appeals Council. [AR 386-87.] There is no basis to consider reopening that previous decision at this late stage.

---

[13]     Although *Califano* provides that a district court can review a decision not to reopen a proceeding where the Commissioner's "denial of a petition to reopen is challenged on constitutional grounds," 430 U.S. at 109, Ms. Sutherlin presents no constitutional argument. Nor has Ms. Sutherlin argued that anything ALJ Kunz did operated as a *de facto* reopening of the prior decision. *See Hardy*, 64 F.3d at 407-08 (analyzing whether the denial of Mr. Hardy's prior application had been *de facto* reopened by later proceedings)

## Recommendation

Based on the foregoing, the Court makes the following recommendation:

1. Ms. Sutherlin's Motion for Summary Judgment **[ECF No. 19]** should be **DENIED**.

2. The Commissioner's Motion for Summary Judgment **[ECF No. 21]** should be **GRANTED**.

3. This case should be **DISMISSED.**

Date: January 12, 2018                          *s/ Katherine Menendez*
                                                Katherine Menendez
                                                United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.